*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 21, 2025
9:06 AM

Plaintiff-Appellee,

v

No. 368936
Wayne Circuit Court
LC No. 22-003045-01-FC

DELRON DEVALL BLACK, JR.,

Defendant-Appellant.

Before: REDFORD, P.J., and FEENEY and BAZZI, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for (1) one count of felony murder, MCL 750.316(1)(b); (2) one count of armed robbery, MCL 750.529; (3) one count of felon-in-possession, MCL 750.224f(6); and (4) three counts of felony-firearm, MCL 750.227b. The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to serve concurrent sentences of (1) life, (2) 20 to 40 years, and (3) 1 to 5 years in prison, for his felony-murder, armed-robbery, and felon-in-possession convictions respectively. The trial court also sentenced defendant to 2 years in prison for each of his felony-firearm convictions, which were to be served concurrently to each other but preceding, and consecutive to, his other sentences. We affirm.

## I. FACTS

This case arises out of the shooting and killing of the victim at a gambling party. The party was hosted at a building leased by Anthony White's then-fiancé, Rashon Cooper-Black.[1] Although White and Cooper-Black both expressed their hesitancy to testify at trial, they both testified as eyewitnesses in this case. Defendant also testified in his own defense.

On the evening of the incident, the victim began to flaunt a box containing a large amount of money. People began arguing, so White started shutting down the party. Two gunshots rang out. White laid down while people ran. When White looked up, he only saw the victim and

---

[1] At the time of the jury trial, White and Cooper-Black were no longer engaged.

-1-

defendant. Defendant had money in one hand and a gun in the other. The victim said, "Damn, man, it's like that?" Defendant responded, "Yeah" and shot the victim three more times. The victim fell at White's feet. Defendant "swung the gun" and stated, "Let me out this bitch, [Kenneth Daniel] grab that money." White replied, "Man, the door open." Daniel picked up the victim's money from the floor, and then he and defendant ran out the front door.[2] White stepped outside the door and heard defendant say, "[White], you know what it is; those cameras." White said, "Man, get the fuck outta here," and defendant and Daniel left. White went back inside, "took down the cameras," and moved "the DVR into the other room" because he was afraid that someone would return for it. White then flagged a police car going down the street.

Cooper-Black testified that she saw the victim fall after he was shot, and she began to render him aid. Although Cooper-Black denied seeing who shot the victim, she admitted that at the preliminary examination, and in her earlier statement to the prosecutor's office, she testified that she saw defendant shoot the victim. Cooper-Black initially testified that she did not recall seeing anyone carrying a gun, but after her memory was refreshed, she testified that she saw defendant with a gun and that she had asked him not to kill her. She further testified that after the shooting, she heard defendant say to Daniels, "Pick up the fucking money," which Daniels did.

A couple days after the shooting, a traffic stop was conducted on defendant's vehicle. Defendant provided the police officers with a false name. After the officers were able to discern defendant's true identity, defendant was arrested, and $6,643 cash was found on his person. Officers noticed that there was "suspected blood" on approximately $1,250 worth of the cash. The bill that appeared to have the darkest staining on it was forensically tested, and after the bill tested positive for blood, it was determined that there was "very strong support" that defendant and the victim were contributors to the DNA mixture. The driver's-seat area of defendant's car also appeared to have dry blood on it. A swab taken from the driver's-seat area was sent for DNA testing, and it was determined that there was "very strong support" that defendant and the victim were contributors to the DNA mixture. It was also discovered that a few minutes before the shooting, defendant sent a text message to Daniel's phone stating the following: "I'm 'bout to take that shit, Bro'. I'm 'bout to take that shit." The DVR footage collected from the scene "stopped" minutes before the shooting occurred.

Defendant testified that when the shooting began, he dropped the money that he was counting and ran to hide behind a wall. After he heard two or three more shots, he ran to the front door to exit, and Daniels followed him. On his way to the front door, defendant bent down and picked up the money that he had dropped; there was a pool of blood near the money. Defendant testified that he saw Cooper-Black rendering aid to the victim and White "puttin' the firearm away [tucking it into his waistband] and grabbing stacks of money out [the victim's] box." Regarding his text message to Daniels, defendant stated that it was merely "gambling talk" and that he was trying to tell Daniels to be patient because Daniels did not want to be there and defendant wanted to stay to win money. Defendant explained that he provided the officers with a false name because

---

[2] Daniel was charged as a co-defendant with felony-murder and armed robbery, but both counts were dismissed by the trial court on March 25, 2024. See Registrar of Actions for *People v Daniel*, Third Circuit Court case number 22-003045-02-FC.

he knew that he "had 20, 30 traffic warrants and [he] didn't want them to tow the car or take [him] to jail."

Defendant was convicted and sentenced, as stated earlier. Defendant now appeals.

## II. GREAT WEIGHT OF THE EVIDENCE

On appeal, defendant first argues that the trial court abused its discretion by denying his motion for a new trial because his convictions were against the great weight of the evidence.[3] We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this argument by moving for a new trial on this ground. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). "We review for an abuse of discretion a trial court's grant or denial of a new trial on the ground that the verdict was against the great weight of the evidence." *Id.* "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).

## B. ANALYSIS

"A trial court may grant a motion for a new trial based on the great weight of the evidence only if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Unger*, 278 Mich App at 232. "Generally, a verdict is against the great weight of the evidence only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Anderson*, 341 Mich App 272, 277; 989 NW2d 832 (2022) (quotation marks and citation omitted). "Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial. Absent exceptional circumstances, issues of witness credibility are for the trier of fact." *Id.* (quotation marks and citation omitted). "The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law." *Unger*, 278 Mich App at 232 (quotation marks and citation omitted).

In this case, defendant essentially "urges this Court to conclude that his version of events was more credible than the evidence offered by the prosecution." *People v Anderson*, 322 Mich App 622, 632-633; 912 NW2d 607 (2018). But "[c]onflicting testimony, even when impeached

---

[3] Although defendant's question presented alternatively argues for a directed verdict of acquittal, defendant has wholly failed to brief this argument. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) (quotation marks and citation omitted). "The failure to brief the merits of an allegation of error constitutes an abandonment of the issue." *Id.* (quotation marks and citation omitted). Accordingly, we decline to address this argument. See *id.*

to some extent, is an insufficient ground for granting a new trial." *People v Musser*, 259 Mich App 215, 219; 673 NW2d 800 (2003) (alteration in original; quotation marks and citation omitted). And "[u]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id*. (quotation marks and citation omitted). Moreover, "the resolution of credibility questions is within the exclusive province of the jury." *Lacalamita*, 286 Mich App at 470. A review of the record in this case indicates that although White's and Cooper-Black's testimonies conflicted with defendant's testimony, neither of their testimonies were "deprived of all probative value . . . or contradicted indisputable physical facts or defied physical realities . . . ." *Id*. (quotation marks and citation omitted).

Defendant argues that White's testimony was "inherently incredible" because White: (1) was the person responsible for stopping the DVR recording before the shooting, (2) hid the cameras and DVR before the police arrived, and (3) was seen pacing at the scene after officers arrived. First, there was no evidence that White was the person who stopped the recording before the shooting. In fact, White was in the video frame when the cameras cut out, and defendant was not. Second, White testified that he did not take the cameras down or move the DVR until after the shooting occurred, and he only moved them at that point because he was afraid that someone would return for the equipment. This was supported by White's testimony that as defendant left the scene, he heard defendant say, "[White], you know what it is; those cameras." There was also no evidence presented that White tampered with the video footage after the shooting. An officer recovered the video from the building with White's assistance "one or two days after the incident." When asked if he erased or altered anything on the DVR before giving it to the police, White responded, "I don't know how to do that." White clarified that "[t]he whole DVR was given to the police," explaining that "[t]he detective made [him] vacate the building the next day, and [he] opened up the building and [they] both went in and got 'em together." Finally, although White was seen pacing at the crime scene after the incident, that behavior does not appear to be particularly suspicious considering that the evening was described as cold and snowy, and White had just witnessed the murder of a person who was "just like family" to him.

It is also worth noting that defendant fled the scene, but White flagged a police officer down, and Cooper-Black called emergency services and rendered aid to the victim. And even though White and Cooper-Black were hesitant to testify, their testimonies substantially corroborated each other. Accordingly, despite the presence of conflicting testimony in this case, the evidence did not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. Therefore, defendant's convictions were not against the great weight of the evidence, and the trial court did not abuse its discretion by denying defendant's motion for a new trial on this ground. See *Unger*, 278 Mich App at 232.

## III. PROSECUTORIAL ERROR

Defendant further alleges three instances of prosecutorial error, and alternatively claims that defense counsel rendered ineffective assistance by failing to raise attendant objections. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defendant failed to contemporaneously object to any of the alleged instances of prosecutorial impropriety, this issue is not preserved. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Similarly, because defendant only raised the alternative ineffective-assistance-of-counsel claim concerning the prosecutorial-vouching argument in his posttrial motion for a new trial, that is the only alternative ineffective-assistance-of-counsel claim that is preserved for appellate review. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020); *People v Sabin (On Second Remand)*, 242 Mich App 656, 658; 620 NW2d 19 (2000). "[A]n objection on one ground is insufficient to preserve an appellate argument based on a different ground." *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011).

"Issues of prosecutorial misconduct are reviewed de novo to determine whether the defendant was denied a fair and impartial trial." *Bennett*, 290 Mich App at 475. But when "a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015) (quotation marks and citation omitted). "A plain error is one that is 'clear or obvious,' and the error must affect the defendant's 'substantial rights.' That is, the defendant must have been prejudiced by the plain error." *Id*. (citation omitted). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." *Id*. (alteration in original; quotation marks and citation omitted).

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008) (quotation marks and citation omitted), amended 481 Mich 1201 (2008). But when a claim of ineffective assistance of counsel is not preserved, "our review is limited to errors apparent on the record." *Unger*, 278 Mich App at 253.

## B. ANALYSIS

As an initial matter, we submit that the term "prosecutorial error" is more appropriate than the term "prosecutorial misconduct" in this case. See *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), ("Although we recognize that the phrase 'prosecutorial misconduct' has become a term of art in criminal appeals, we agree that the term 'misconduct' is more appropriately applied to those extreme—and thankfully rare—instances where a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct.") (citations omitted).

"Generally, to prevail on a claim of prosecutorial misconduct, a defendant must show that he was denied a fair and impartial trial." *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016). "A prosecutor can deny a defendant his or her right to a fair trial by making improper remarks that so infect the trial with unfairness as to make the resulting conviction a denial of due process." *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014) (quotation marks and citation omitted). "We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's comments in context and in light of the defendant's arguments."

*Id.* at 62-63. "A defendant is entitled to a fair trial, not a perfect one." *Solloway*, 316 Mich App at 201.

## 1. VOUCHING IN CLOSING ARGUMENT

Defendant first argues that the prosecutor plainly erred by improperly vouching for White's and Cooper-Black's testimonies in his closing argument, telling the jury that the witnesses were afraid of defendant even though there were no facts in evidence suggesting as much. We disagree.

"Generally, prosecutors are accorded great latitude regarding their arguments, and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). "A prosecutor may not vouch for the credibility of witnesses by claiming some special knowledge with respect to their truthfulness; however, the prosecutor may argue from the facts that a witness should be believed." *People v McGhee*, 268 Mich App 600, 630; 709 NW2d 595 (2005) (citations omitted). "[A] prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004).

In this case, during his closing arguments, the prosecutor stated that White testified despite not wanting to. The prosecutor then made the following statement: "And you'll notice that the whole time he was staring directly at the jury. He did not want to have anything to do with [defendant]. I believe that's cause he was scared." The prosecutor also noted Cooper-Black's hesitancy to testify, and stated as follows: "And, again, she looked directly at you guys the whole time. Again, was upset, did not want to look in [defendant's] direction. And, again, I think that's because she was scared."

The prosecutor's statements did not indicate a level of special knowledge concerning White's and Cooper-Black's truthfulness. This is evidenced by the fact that the statements were preceded with the modifying phrases of "I believe" and "I think," as well as the fact that the prosecutor explicitly advised the jurors that it was their job to determine the credibility of witnesses. Instead, the prosecutor merely provided a reasonable inference gathered from the evidence of the case, which he was permitted to do. See *id.* at 454 ("[T]he prosecutor is permitted to argue the evidence and all reasonable inferences arising from it"). When making these statements, the prosecutor primarily relied on the following evidence: (1) defendant testified that White and Cooper-Black would not look at him during their testimonies, and (2) White and Cooper-Black were both hesitant to testify in this case. It is true that neither White nor Cooper-Black directly testified that they were scared of defendant; however, there was evidence presented that could allow a reasonable person to draw such a conclusion. For example, Cooper-Black testified that when she saw defendant with a gun after the shooting, she said, "Please don't kill me." Such a statement displays that at some point, Cooper-Black was scared of defendant. Similarly, White testified that after the shooting, defendant said, "[White], you know what it is; those cameras," which prompted White to take the cameras down out of fear that someone would return for them. Again, White's reaction to defendant's statement displays a level of fear. Accordingly, the prosecutor did not err by arguing the evidence and all reasonable inferences arising from it. See *id.*

Furthermore, even if the prosecutor's statements were improper, any prejudice caused by the remarks was alleviated by the trial court's jury instructions, namely that the jurors must decide the case on the evidence presented and that the remarks of counsel were not evidence. See *id*. 454-455 ("[T]he trial court instructed the jurors that they must decide the case on the evidence and that the remarks of counsel were not evidence. This instruction was sufficient to eliminate any prejudice that might have resulted from the prosecutor's remarks"). "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

Moreover, there was overwhelming evidence of defendant's guilt in this case. White testified that he saw defendant shoot the victim and tell Daniels to grab the money. Cooper-Black testified that after the shooting occurred, she saw defendant with a gun, and she heard him tell Daniels to pick up the money. Cooper-Black also acknowledged that at the preliminary examination and in her earlier statements to the prosecutor's office, she testified that she saw defendant shoot the victim. Additionally, a few minutes before the shooting occurred, defendant sent a text message to Daniel's phone stating the following: "I'm 'bout to take that shit, Bro'. I'm 'bout to take that shit." When defendant was arrested, the officers collected $6,643 from his person, of which, $1,250 appeared to have blood on it. The bill that appeared to have the darkest staining on it was forensically tested, and after the bill tested positive for blood, it was determined that there was "very strong support" that defendant and the victim were contributors to the DNA mixture. The driver's seat area of defendant's car also appeared to have dry blood on it. A swab taken from the driver's-seat area was sent for DNA testing, and it was determined that there was "very strong support" that defendant and the victim were contributors to the DNA mixture. Moreover, defendant was last seen on the video footage approximately 31 seconds before the recording stopped, whereas White was in the video frame when the cameras cut out. Accordingly, defendant failed to show that the jury's guilty verdict was based on the prosecutor's closing statements as opposed to the strong evidence of his guilt.

Defendant further argues that if the trial court's jury instructions cured the alleged prosecutorial error, then defense counsel was ineffective for failing to object to such error. Because we conclude that the prosecutor's comments were proper in this case, any objection to the prosecutor's arguments would have been futile. See *Thomas*, 260 Mich App at 457-458. "Counsel is not ineffective for failing to make a futile objection." *Id*. at 458. "Furthermore, defendant is required to demonstrate prejudice to obtain relief on a claim of ineffective assistance." *Id*. We conclude that "any minimal prejudice was alleviated by the trial court's instruction to the jury that the case was to be decided on the evidence and that the comments of counsel were not evidence. Therefore, defendant has failed to carry his burden of demonstrating ineffective assistance." *Id*.

### 2. ALLEGING THAT DEFENDANT UNPLUGGED THE DVR

In a Standard 4 brief,[4] defendant further argues that the prosecutor plainly erred by alleging, in his opening statement, that defendant was the person who unplugged the DVR. We disagree.

---

[4] See Administrative Order No. 2004-6, 471 Mich ci, cii, Standard 4 (2004).

In his opening statement, the prosecutor stated as follows:

> And you're gonna hear from Mr. White who's also gonna testify about what's on the video and he's gonna point him out. But one thing I want you to pay attention to is you don't see a—you don't see the shooting take place. But one thing you do see is [defendant] go around—everybody leaves the room and [defendant] is the only one in the room, goes around and all of sudden the video stops. Now you're gonna see this and you're gonna see and we're gonna explain to you why that is, *why we believe that [defendant] unplugged the DVR so as not to show the shooting.*

Again, the prosecutor's statement did not indicate a level of special knowledge concerning who unplugged the DVR. This is evidenced by the fact that the statement was preceded with the modifying phrase of "we believe," as well as the fact that the prosecutor explicitly advised the jurors that it was their job to determine the credibility of witnesses. Instead, the prosecutor merely provided a reasonable inference gathered from the evidence of the case, which he was permitted to do. See *Seals*, 285 Mich App at 22; *Thomas*, 260 Mich App at 454.

Contrary to defendant's argument on appeal, there was evidence that could allow a reasonable person to infer that defendant, not White, unplugged the DVR. Defendant was last seen on the video footage approximately 31 seconds before the recording stopped; whereas, White was in the video frame when the cameras cut out. Although White testified that he took the cameras down and moved the DVR after defendant left the scene, he stated that he only did so because he was afraid that someone would return for them. Notably, there was no evidence introduced that White touched the cameras or DVR until that point. White clarified that he did not pay attention to whether the DVR was plugged in or not when he moved it, and he stated that he did not alter anything on the DVR before giving it to the police. Additionally, even though defendant testified that he did not see, or tamper with, any cameras or DVR devices, he also admitted that he knew there were surveillance cameras within the building. Accordingly, the prosecutor did not err by arguing the evidence and all reasonable inferences arising from it. See *Seals*, 285 Mich App at 22; *Thomas*, 260 Mich App at 454.

Furthermore, even if the prosecutor's statements were improper, the trial court's jury instructions alleviated any prejudice arising from the remarks, namely that the jurors must decide the case on the evidence presented and that the remarks of counsel were not evidence. See *Thomas*, 260 Mich App 454-455. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Abraham*, 256 Mich App at 279. Moreover, as previously stated, there was overwhelming evidence of defendant's guilt in this case, and defendant has failed to show that the jury's guilty verdict was made on the basis of the prosecutor's statement as opposed to the strong evidence supporting his guilt.

Defendant also appears to argue that if this Court determines that if the trial court's jury instructions cured the alleged prosecutorial error, then defense counsel was still ineffective for failing to object to such error. Because we conclude that the prosecutor's comments were proper in this case, any objection to the prosecutor's arguments would have been futile. See *Thomas*, 260 Mich App at 457-458. "Counsel is not ineffective for failing to make a futile objection." *Id*. at 458. "Furthermore, defendant is required to demonstrate prejudice to obtain relief on a claim of

ineffective assistance." *Id*. We conclude that "any minimal prejudice was alleviated by the trial court's instruction to the jury that the case was to be decided on the evidence and that the comments of counsel were not evidence. Therefore, defendant has failed to carry his burden of demonstrating ineffective assistance." *Id*.

### 3. ADMITTANCE OF DVR FOOTAGE

In his Standard 4 brief, defendant further argues that the DVR footage should not have been admitted at trial, and "the admittance of such creates another instance of prosecutorial misconduct." Alternatively, defendant argues that defense counsel was ineffective for failing to object to its admission. We disagree.

As an initial matter, this argument is more suited to an evidentiary analysis, not a prosecutorial-error analysis. Regardless, this issue is waived because defense counsel stated that he had no objections to the DVR footage being admitted. "Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *People v Klungle*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket Nos. 364125; 367795); slip op at 3 (quotation marks and citation omitted). "A failure to object to an error constitutes mere forfeiture of an error, but affirmative approval constitute[s] a waiver." *People v Jones*, ___ Mich App ___, ___; ___NW3d ___ (2025) (Docket No. 362854); slip op at 15 (alteration in original; quotation marks and citation omitted). "Waiver is defined as the intentional relinquishment or abandonment of a known right." *Id*. (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id*. (quotation marks and citation omitted). Accordingly, defense counsels' statements effectuated waiver of this issue. See *id*.

Nonetheless, this claim lacks merit. Defendant cursorily argues that the video's admission violated: (1) MRE 1002[5] because it was unknown whether the recording was the "original" recording as White was in control of it "for several days and no one ha[d] ever authenticated" it, and (2) MRE 1003 and MRE 1004 because an expert witness did not attest to the video's authenticity or explain why certain parts were missing. This argument is unpersuasive considering that the video appeared to be the original recording, without any editing. An officer recovered the video from the building with White's assistance "one or two days after the incident." White explained that "[t]he detective made [him] vacate the building the next day [after the shooting], and [he] opened up the building and [they] both went in and got 'em together." Therefore, it does not appear that White had any control over the DVR after police arrived at the scene. White also clarified that he did not tamper with the DVR and that "[t]he whole DVR was given to the police." Detective Antonio Carlisi of the Detroit Police Department was able to extract and download one camera view from 9:40 p.m. to 11:29 p.m. on the evening of the incident. The video footage simply "stopped" at 11:29 p.m. and did not show the shooting. Detective Carlisi testified that he

---

[5] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial

did not alter the video in any way. Because no error occurred, defense counsel was not ineffective for failing to make a futile objection. See *Thomas*, 260 Mich App at 458.

## IV. WHITE'S PRIOR CONVICTION

Defendant further argues that the trial court erred by excluding White's prior conviction from the evidence. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Defendant preserved this issue by objecting to the prosecutor's motion in limine to exclude evidence of White's prior conviction. See *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). "This Court reviews for an abuse of discretion a trial court's decision whether to admit or exclude evidence." *People v Snyder*, 301 Mich App 99, 104; 835 NW2d 608 (2013). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *Id*. (quotation marks and citation omitted). "Preliminary issues of law, including the interpretation of the rules of evidence and the effect of constitutional provisions, are reviewed de novo." *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

## B. ANALYSIS

At the time of trial, MRE 609(a) stated the following:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the evidence has been elicited from the witness or established by public record during cross-examination, and

>    (1) the crime contained an element of dishonesty or false statement, or

>    (2) the crime contained an element of theft, and

>    >    (A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and

>    >    (B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.

Accordingly, "MRE 609 permits the admission of evidence of some prior convictions, but for a specific and narrowly defined purpose: impeachment of a witness's credibility." *Snyder*, 301 Mich App at 105. "The Supreme Court has recognized the danger that 'a jury will misuse prior conviction evidence by focusing on the defendant's general bad character, rather than solely on his character for truthtelling.'" *Id*. (citation omitted). Therefore, "MRE 609 creates a presumption that evidence of prior convictions is inadmissible to impeach a witness's credibility." *Id*. But that presumption can be overcome. *Id*. "First, if the prior conviction 'contained an element

-10-

of dishonesty or false statement,' it is admissible with no further analysis required. MRE 609(a)(1)." *Id*. "Second, if the prior conviction 'contained an element of theft,' it may be admissible if certain conditions are met. MRE 609(a)(2)." *Id*.

In this case, at the preliminary examination, defense counsel asked White whether he had been convicted of a crime involving death or dishonesty in the last 10 years, and White responded "[y]es." After the preliminary examination, the prosecutor discovered that White had "a prior felony conviction from [June 2015] in Oakland County for Receiving and Concealing Stolen Property—$20,000 or more, in violation of MCL 750.535(2)(a)." Thereafter, the prosecutor moved in limine to exclude evidence of White's prior conviction, arguing that the conviction did not contain an element of dishonesty or false statement, or have *significant* probative value on the issue of credibility; therefore, it was not admissible under MRE 609(a)(1) or (2). Although there is nothing in the record indicating a grant or denial of the prosecution's motion, both parties suggest that the trial court ultimately excluded White's prior conviction, and White's prior conviction was not discussed at trial.

### 1. MRE 609(a)(1)

Defendant first argues that the trial court abused its discretion by excluding evidence of White's prior conviction because the crime of receiving and concealing stolen property contains "an element of dishonesty or false statement" pursuant to MRE 609(a)(1).

In *People v Parcha*, 227 Mich App 236, 242; 575 NW2d 316 (1997), this Court explained that although "[t]he view has been expressed that all crimes involving theft necessarily involve dishonesty," our Supreme Court rejected that view in *People v Allen*, 429 Mich 558, 564, 605; 420 NW2d 499 (1988), by amending MRE 609 and specifically treating theft offenses separately from offenses involving dishonesty and false statements. "[T]he *Allen* Court concluded that theft offenses, as a rule, are not so reflective of one's truthfulness as to warrant automatic admission into evidence of evidence of a prior conviction of such an offense." *Parcha*, 227 Mich App at 243. "In contrast, the Court reasoned that crimes having elements of dishonesty or false statement *were* sufficiently probative of one's veracity to justify admission into evidence of evidence of a prior conviction of one of those crimes." *Id*. "Such crimes, in the nature of *crimen falsi,* could be identified by the fact that they did not merely imply dishonesty on the part of the perpetrator, but incorporated a dishonest act, such as active deceit or falsification, as an element of the offense itself." *Id*. "Being convicted of such an offense did not imply dishonesty, but reflected it." *Id*.

Therefore, "the *Allen* decision drew a distinction between theft offenses and offenses involving dishonesty or false statement, a distinction maintained in the current version of MRE 609." *Id*. "By delineating two discrete approaches to determining whether evidence of a prior conviction is admissible into evidence—one for crimes containing an element of dishonesty or false statement, one for crimes containing an element of theft—the Court emphasized that theft offenses do not necessarily contain an element of dishonesty or false statement." *Id*. at 243-244. "To now construe MRE 609 in any other fashion would render nugatory MRE 609(a)(2), for if all theft offenses contain an element of dishonesty because they involve theft, MRE 609(a)(2) would be mere surplusage, serving no purpose." *Id*. at 244. "Therefore, pursuant to *Allen,* we must first consider whether the particular theft offense of which a defendant was convicted is in the nature

-11-

of *crimen falsi*." *Id*. Accordingly, whether a theft offense "is admissible pursuant to MRE 609(a)(1) turns on the specific factual underpinning of the conviction." *Id*. at 247.

The elements of receiving and concealing stolen property are as follows:

> (1) that the property was stolen; (2) the value of the property; (3) the receiving, possession or concealment of such property by the defendant with the knowledge of the defendant that the property had been stolen; (4) the identity of the property as being that previously stolen; and (5) the guilty constructive or actual knowledge of the defendant that the property received or concealed had been stolen. [*People v Matuja*, 77 Mich App 291, 295; 258 NW2d 79 (1977).]

The elements of this offense suggest that a defendant could commit the crime by an actual "dishonest act, such as active deceit or falsification," but there is no binding precedent declaring the offense to be definitively either a crime of theft or a crime of dishonesty. Indeed, Justice MARKMAN dissented from the Supreme Court's denial of leave to appeal to consider this very issue in *People v Ferrier*, 463 Mich 1007, 1007; 624 NW2d 736 (2001).

In this case, we are given no insight into the context surrounding White's prior conviction of receiving and concealing stolen property. Without information regarding the "specific factual underpinning of the conviction," neither the trial court nor this Court could determine whether White's prior conviction would be admissible to impeach his testimony as an offense involving elements of dishonesty or false statement. See *Parcha*, 227 Mich App at 247. Regardless, it is unnecessary to resolve this question because defendant cannot establish the necessary prejudice to warrant relief. See *id*. Under the harmless-error rule, "it is presumed that preserved, nonconstitutional error—such as evidentiary error—is harmless, and to overcome that presumption the appellant bears the burden of demonstrating, on the strength of the entire record, that it is more probable than not that the error was outcome determinative." *People v Propp*, 340 Mich App 652, 661-662; 987 NW2d 888 (2022) (quotation marks and citation omitted), aff'd 15 NW3d 591 (2025). As previously stated, there was overwhelming evidence of defendant's guilt in this case, and a reasonable juror could find from the evidence presented at trial that defendant was guilty of the charged crimes. See *Parcha*, 227 Mich App at 247. Defendant has failed to demonstrate that it is more probable than not that any error in this regard was outcome determinative. See *Propp*, 340 Mich App at 611-662.

### 2. MRE 609(a)(2)

Defendant further argues that the trial court abused its discretion by excluding evidence of White's prior conviction under MRE 609(a)(2).

As an initial matter, appellee does not dispute that White's conviction was considered a theft crime, or that it met the first requirement of MRE 609(a)(2)(A) (punishable by imprisonment for at least one year). Therefore, the question turns to the second required condition under MRE 609(a)(2)(B), that is whether "the court determines that the evidence has significant probative value on the issue of credibility . . . ." Noticeably, defendant wholly fails to address this issue in his appellate brief; instead, he merely notes that White's prior conviction met the first requirement under MRE 609(a)(2) because it was "punishable by imprisonment in excess of one year." "An

appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) (quotation marks and citation omitted). "The failure to brief the merits of an allegation of error constitutes an abandonment of the issue." *Id*. (quotation marks and citation omitted). Accordingly, we decline to address this argument. See *id*.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In his Standard 4 brief, defendant further argues that defense counsel was ineffective for failing to: (1) contact or investigate the other eyewitnesses, (2) hire an independent forensic video expert, and (3) properly impeach White and Cooper-Black. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

This issue is not preserved because although defendant raised a claim of ineffective assistance of counsel in his motion for a new trial, that motion did not include the alleged instances of ineffective assistance of counsel that defendant now raises in his Standard 4 brief. See *Abcumby-Blair*, 335 Mich App at 227; *Danto*, 294 Mich App at 605; *Sabin*, 242 Mich App at 658. "The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *Trakhtenberg*, 493 Mich at 47. But "[b]ecause these claims of ineffective assistance of counsel are unpreserved, our review is limited to errors apparent on the record." *Unger*, 278 Mich App at 253.

## B. ANALYSIS

In *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984), the United States Supreme Court established a two-prong test that a defendant must meet to prove that his or her counsel's assistance was so defective as to require a new trial. The test is as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. [*Id*.]

Stated more simply, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. To show that a counsel's performance was deficient, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*

Because there are countless ways to provide effective assistance in a given case, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of

-13-

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (quotation marks and citation omitted). "Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012) (quotation marks and citation omitted), vacated in part on other grounds 493 Mich 864 (2012). This Court has further stated that

> a reviewing court must conclude that the act or omission of the defendant's trial counsel fell within the range of reasonable professional conduct if, after affirmatively entertaining the range of possible reasons for the act or omission under the facts known to the reviewing court, there might have been a legitimate strategic reason for the act or omission. [*Id*. at 22-23.]

## 1. FAILURE TO CONTACT OTHER EYEWITNESSES

Defendant first argues that defense counsel was ineffective for failing to contact or investigate the other eyewitnesses who could have provided a more accurate depiction of the events that occurred. We disagree.

A reviewing court will defer to counsel's strategic judgments, but strategic choices made after an incomplete investigation are reasonable only to the extent that reasonable professional judgments support the limitation on investigation. See *Strickland*, 466 US at 690-691. When claiming ineffective assistance because of defense counsel's unpreparedness, a defendant must show prejudice resulting from the lack of preparation. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990).

As an initial matter, defendant has failed to show that defense counsel did not attempt to contact the other eyewitnesses. For example, he does not suggest that an eyewitness has indicated that had defense counsel attempted contact, he or she would have testified in the defendant's favor or even responded. In fact, the lead investigative officer in this case testified that he attempted to contact the other eyewitnesses, but "[t]he few people that actually responded to [his] phone calls flat-out told [him] they will not talk. Most of them just flat-out ignored it." Accordingly, the other eyewitnesses were unwilling to cooperate in this case. Therefore, even assuming arguendo that defense counsel provided deficient performance by failing to contact the other eyewitnesses, defendant has failed to meet the second prong of the *Strickland* test—prejudice from the lack of preparation—because any attempt to contact the other eyewitnesses would not have been successful. See *id*. Accordingly, defendant has failed to show that defense counsel's performance was deficient in this regard, and even if it was, defendant has not shown that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See *Strickland*, 466 US at 687, 694.

## 2. FAILURE TO HIRE A FORENSIC VIDEO EXPERT

Defendant further argues that defense counsel was ineffective for failing to hire an independent forensic video expert who could have determined which portions of the video were deleted and disprove that the DVR was merely unplugged. We disagree.

Defendant alleges that the video must have been tampered with, but there was absolutely no testimony introduced in support of this argument. As previously explained, the record supports the conclusion that the video appeared to be the original recording, without any editing: (1) Detective Carlisi's exclusive job was to extract and "forensically retrieve" videos from DVR's, computers, and "base systems"; (2) Detective Carlisi explained that the video footage in this case simply "stopped," not that it was fragmented; (3) Detective Carlisi testified that he did not alter the video in any way; (4) an officer recovered the video from the building with White's assistance "one or two days after the incident"; (5) White explained that "[t]he detective made [him] vacate the building the next day, and [he] opened up the building and [they] both went in and got 'em together"; (6) White testified that he did not tamper with the DVR; and (7) White testified that "[t]he whole DVR was given to the police." Because there was no evidence suggesting that the video had been tampered with after it had been stopped, defense counsel did not exercise unreasonable professional judgment by failing to hire an independent forensic video expert. Accordingly, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id*. at 689.

But even assuming that defense counsel provided deficient performance by not hiring an independent forensic video expert, defendant failed to meet the second prong of the *Strickland* test—prejudice to the defense. As previously stated, there was overwhelming evidence of defendant's guilt in this case. Accordingly, defendant has failed to show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

### 3. FAILURE TO IMPEACH WHITE AND COOPER-BLACK

Defendant further argues that defense counsel was ineffective for failing to impeach White and Cooper-Black with their pretrial statements to police. We disagree.

In his Standard 4 brief, defendant alleges that White gave the following statement to a police officer:[6]

> . . . I walked over to the front door to unlock it and have everyone leave and I heard a "pop" I looked over and see [the victim] coming from the corner, I hear another "pop" I ducked and seen [defendant] shoot [the victim] he dropped [defendant] told [Daniel] to grab the money I seen [Daniel] grab the money the[n defendant] told me "let me out this bitch" I told him "the door is not locked" then they ran out to the car and [defendant] was waiving the gun around saying "[White] you know what time it is them cameras" so I went inside and ripped the cameras down and hide the dvr in the other room cause I didn't know if he would come back.

---

[6] This statement was not contained in the lower court file.

Defendant argues that this statement contradicted White's trial testimony because at trial, White "claimed to have seen the gun but in this statement when asked about the gun he said that he had not seen it." First, this alleged pretrial statement indicates that White saw the gun as defendant ran to the car. Nonetheless, defense counsel impeached White on this exact issue during cross examination. Defense counsel clarified that White's testimony at trial was that after the shooting, he saw the gun smoking in defendant's hand; however, the day after the shooting, White told police that he did not see defendant holding a gun, he simply heard Daniel give the gun to defendant. White testified that he was hesitant to give a statement to the police in the beginning of this case because he was worried about being labeled a "snitch." Accordingly, he explained that he was not as "complete as possible" in his police interview because he did not want to get anyone else in trouble. Because defense counsel impeached White in the exact way that defendant now claims defense counsel should have, this argument must fail. It is worth nothing that defense counsel also impeached White in a number of other ways throughout his thorough cross-examination.

In his Standard 4 brief, defendant further alleges that Cooper-Black gave a statement to police, saying that "[t]here was no threats arguing nothing before the shooting."[7] Defendant argues that Cooper-Black's pretrial statement to police contradicted her trial testimony because at trial, Cooper-Black "testified that she heard the victim ask [defendant] if 'its like that' and that [defendant] then allegedly said 'yes' and began to shoot." Defendant mischaracterizes Cooper-Black's testimony. At trial, Cooper-Black testified that "*after the first shot*," she heard the victim ask defendant if "it like that," and defendant responded, "Yes." Accordingly, her trial testimony did not contradict the alleged pretrial testimony that defendant now presents: that "[t]here was no threats arguing nothing *before the shooting*." Because there was no inconsistency for defense counsel to impeach Cooper-Black in this regard, this argument must fail. It is worth nothing that during Cooper -Black's direct examination, the prosecution pointed out many inconsistencies in Cooper-Black's statements, and during her lengthy cross-examination, defense counsel repeated those inconsistencies and impeached her further.

## 4. CUMULATIVE ERROR

Defendant further argues that defense counsel's individual and cumulative errors infringed on his right to a fair trial. The cumulative effect of several minor errors may warrant reversal even when individual errors in the case would not warrant reversal. *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). But because there was no error in this case, there was also no cumulative error.

## VI. NEWLY DISCOVERED EVIDENCE

---

[7] This statement was not contained in the lower court file.

In his Standard 4 brief, defendant also argues that he is entitled to a new trial, or at the very least, a *Ginther*[8] hearing,[9] because there is new evidence that goes to White's credibility. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because defendant failed to move for a new trial on this ground, this issue is not preserved for appellate review. See *People v Darden*, 230 Mich App 597, 605; 585 NW2d 27 (1998). We review unpreserved issues for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). As previously stated, "[a] plain error is one that is 'clear or obvious,' and the error must affect the defendant's 'substantial rights.' That is, the defendant must have been prejudiced by the plain error." *Cooper*, 309 Mich App at 88 (citation omitted). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." *Id*. (alteration in original; quotation marks and citation omitted).

## B. ANALYSIS

A new trial may be granted on the basis of newly discovered evidence if the defendant can show the following: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Lemons*, 514 Mich 485, 514-515; 22 NW3d 42 (2024) (quotation marks and citation omitted). "The defendant carries the burden of satisfying all four parts of this test." *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). If these four requirements are satisfied, "impeachment evidence alone can be a sufficient basis for a new trial . . . ." *People v Rogers*, 335 Mich App 172, 198; 966 NW2d 181 (2020). Impeachment evidence does not ordinarily merit a new trial, but also does not preclude a new trial merely because it is impeachment evidence, provided that the impeachment goes to the heart of the witness's trial testimony and a different result would be probable on retrial. *People v Grissom*, 492 Mich 296, 315-320; 821 NW2d 50 (2012). It is "well established that motions for a new trial on the ground of newly-discovered evidence are looked upon with disfavor, and the cases where this court has held that there was an abuse of discretion in denying a motion based on such grounds are few and far between." *Id*. at 279-280 (quotation marks and citation omitted). When analyzing the evidence offered for retrial, courts must consider whether a reasonable juror could find the evidence credible on retrial. *Rogers*, 335 Mich App at 201.

---

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[9] Defendant cursorily argues his entitlement to a *Ginther* hearing without adequately briefing it or raising it in his questions presented; accordingly, we decline to address this argument. See *Iannucci*, 314 Mich App at 545 ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue.") (quotation marks and citation omitted); *Miller*, 238 Mich App at 172 (declining to address an issue that was not raised in the defendant's questions presented).

On appeal, defendant provides the following signed statement from his father:

> My name is Delron Black senior this is an affidavit stating facts on how Anthony White one of the testifying witnesses against my son Delron Black jr. was reaching out to me a few weeks prior to my son's trial date. Anthony White told me the police threatened to take him and his wife to jail for running a illegal gambling house. And at the time when he was being questioned he was up under so much pressure from the police to give names he had to think fast and he gave the police the street names of CASH-KID [defendant] and Kay [Daniels]. He said he didn't mean to put it on them but he was under pressure so he fabricated a story. And he said not to worry because he wasn't going to show up in court anyway. And as the trial date got closer he reached out again asking for money not to show up. Unfortunately I was shot and hospitalized in a coma and unable to be present at the trial date to make the defense attorney aware of that information. It is known on the streets that Anthony White AKA TJ is the one responsible for the death of the deceased in this case. [White] was allowed to hold on to the DVR for 3 days before turning it in to police. He erased critical evidence it is also known on the streets that [White] broke into the deceased house after the incident stealing money and valuables from the deceased. [White] is a known criminal and at this point he has been allowed to get away with murder. [White] is the one that should have been on trial and someone needs to take a closer look into [White].

The evidence that defendant proffers on appeal is unpersuasive because it is replete with misinformation, hearsay, and a noticeable lack of evidentiary support. For example, contrary to defendant's father's statement that White "was allowed to hold on to the DVR for 3 days before turning it in to police," the evidence at trail—from White and the lead investigator in this case—displayed that an officer recovered the video from the building with White's assistance "one or two days after the incident." White explained that "[t]he detective made [him] vacate the building the next day, and [he] opened up the building and [they] both went in and got 'em together." Therefore, it does not appear that White had any control over the DVR after police arrived at the scene. Additionally, much of defendant's father's statement relies on what is "known on the streets," not what he has directly observed. Defendant's father also fails to provide any evidence showing that White "reached out" to him or that he was indeed injured and unable to share such information with defense counsel before the trial. Phone records or hospital bills would have made his statements more persuasive. As it stands, it does not appear that a reasonable juror could find the evidence credible on retrial. *Id.* Additionally, considering the fact that Cooper-Black also testified as an eyewitness—and largely corroborated White's testimony—defendant has failed to show that this new evidence would make "a different result probable on retrial." See *Lemons*, 514 Mich at 514-515 (quotation marks and citation omitted).

Affirmed.

/s/ James Robert Redford
/s/ Kathleen A. Feeney
/s/ Mariam S. Bazzi

-18-